## THE NATCHEZ.

NATCHEZ & N. O. PACKET CO. *v.* MANNHEIM INS. CO. SAME *v.* LOUIS-
VILLE UNDERWRITERS. SAME *v.* ST. PAUL, FIRE & MARINE INS. CO.
SAME *v.* DAKOTA FIRE & MARINE INS. CO.

*(District Court, E. D. Louisiana. April 25, 1890.)*

1. MARINE INSURANCE—LOSS—PERILS OF RIVER.
    A river steam-boat ran upon a bar, and, upon being taken off, it was found that
    her seams had opened, and that she was leaking badly. To keep her from sinking,
    she was beached upon another bar. While there the river rose rapidly, and de-
    stroyed the vessel. *Held*, that she was lost by a peril of the river.

2. SAME—NEGLIGENCE.
    The night being dark when the vessel ran upon the first bar, and the act of run-
    ning her upon the second bar having been done in good faith, to keep her from
    sinking, the facts do not show negligence on the part of the master.

3. SAME.
    The fact that help could have been obtained after the vessel was grounded the
    second time, and before she was destroyed, does not make the failure to procure
    such help negligence, when it is not shown that the help would have been effectual,
    or that the master knew of its existence.

4. SAME—ABANDONMENT.
    Where insurers are notified that a wrecked vessel is abandoned to them, and the
    owners and master believe that the insurers will take possession of her, the fact
    that the master and owners take no further steps to save the vessel does not relieve
    the insurers from liability on the policy of insurance.

5. SAME—PREMIUM NOTE.
    The fact that part of the insurance premium has been paid by a note which is
    overdue and unpaid at the time of the loss does not avoid the policy, but the amount
    due on the note should be deducted from the amount of the insurance.

In Admiralty.

*O. B. Sansom*, for libelant.

*J. R. Beckwith*, for defendants.

BILLINGS, J. These suits were by consent tried together. They are
brought upon policies of insurance upon the steam-boat Natchez, the
libelant contending that the steam-boat became a total loss under the
policies; and the real question between the parties seems to be whether
her destruction was under such circumstances as to make her a loss un-
der the policies. The answers in all the cases are the same, and besides
the matters set up with reference to the jurisdiction of this court over
the causes, and with reference to the service of respondents through the
statutory agent, present the following matters upon the merits: *First*.
That the premiums were not paid in cash, but by a promissory note
which is unpaid and overdue; and that the insurance was, with certain
exceptions, only against the unavoidable dangers of the river, and against
fire. *Second*. That the vessel insured was not seaworthy, in that it was
not furnished with sufficient tackle and appliances, or with proper master,
officers, and crew; and was unskillfully and negligently navigated, and
through unskillfulness and negligence was run upon a sand-bar in the
Mississippi river, from which she was soon relieved by being backed off,
and was thereafter, through negligence and unskillfulness, permitted to
fill with water, and voluntarily beached or run aground; that the vessel

was not equipped with pumps and machinery, and, through want of ordinary care and skill those appliances which she had were made ineffectual to keep her afloat; that after the vessel was run ashore her destruction could have been avoided; that additional pumps could have been produced, but were not; that after the vessel was grounded proper care was not used to save her, especially the machinery; that proper proofs of loss have not been presented; that there never was any abandonment.    There is also a denial of the value as alleged, viz., $100,000; and of the insurable interest of the libelants.    It thus appears that, with the exception of the execution of the policy of insurance, all of the material facts necessary to enable a party to recover upon the policy are put at issue by denial or affirmative averments.

The facts necessary to be considered are the following: After midnight, and before dawn, on the morning of January 1, 1889, the Natchez, the night being, as some witnesses call, "dark," others "misty," and one witness calls "gray," ran upon a bar.    By her own efforts, and the aid of the steam-tug Sunflower, she was gotten off.    She was taken over to Lake Providence, and it was found that her seams had been opened; that she was leaking badly, and was sinking, and in danger of careening over in the deep water at Lake Providence; and, under the directions of the master, Capt. Bowling T. Leathers, the pilot took her and beached her upon a bar, which, though there is some testimony as to its character for permanence, was, by them, considered a suitable bar for this purpose.    The master telegraphed to T. P. Leathers, who published the fact of her disaster in the papers.    This brought Capt. Harpham and Mr. Bailey in the afternoon of the 1st to Capt. Leathers, who was the general manager of the owners of the Natchez.    Capt. T. P. Leathers read the dispatch to both of them, and said to Capt. Harpham, in effect, that he abandoned her to the underwriters.    He believed Capt. Harpham had authority to receive such abandonment.    According to Capt. Harpham's testimony, he had no such authority; but according to Mr. Bailey's testimony, he (Mr. Bailey) had.    Capt. T. P. Leathers clearly believed he had abandoned her, though Mr. Harpham urged that it was the duty of the officers of the boat to do all they could to save her. Capt. T. P. Leathers gave Capt. Harpham two letters to his son, they understanding that Capt. Harpham was to start that night for the Natchez, and telegraphed to his son, the master, that Harpham would come and take custody of the Natchez, and that the master must aid him. Capt. Bowling T. Leathers received the telegram, and subsequently the letters by mail, and in consequence discharged the crew, and waited for Capt. Harpham, who, in consequence of a telegram from the agent of the Louisville underwriters, did not go.    Capt. T. P. Leathers did not know that Capt. Harpham had not gone, and was not in charge of the boat until Friday night.    On Saturday, January 5th, the river had continued to rise rapidly, the Natchez broke open, and became a complete wreck.    Nothing was saved from the Natchez, except some cabin furniture, which netted but little.    Upon these facts, the conclusions of law are:

1. The steam-boat Natchez was lost by reason of a peril of the river, not excepted, and therefore included in the indemnifying clause of all four policies, viz., grounding or stranding upon a bar of the river. 1 Pars. Mar. Ins. (Ed. 1868,) pp. 546, 547, and authorities cited in note.

2. That the vessel was seaworthy; that her masters, officers, and crew were suitable and proper, and as to the pumps, which was the point to which the evidence and argument were specially directed, that they were adequate. Upon this point the testimony of Wilson Bloodgood, an inspector, who speaks of the Natchez as of the date of his inspection, September 27, 1888, testifies as follows:

"She [the Natchez] had a very large supply of bilge pumps, [bilge pumps means pumps used to free the hold of water.] She had two attached to the 'doctor' or pumping engine, [that is a regular supply pump;] the donkey pump, [that means auxiliary feed pumps;] also pump out of the hold or bilge pumps. In addition, she had ten siphons."

3. As to want of skill and negligence in incurring and causing the grounding on the first and on the second bar. The steam-boat, it would seem, received great injury, which opened her seams and caused copious leakage by running upon the sand-bar. The night was dark, the government light was out, and the objects on the shore were but dimly visible. The capacity of the master and the pilot is unimpeached, and they were reasonably attentive. Therefore, as matter of evidence, the running upon the first sand-bar was not attributable to want of skill or care, but to the class of experiences, which, though connected with navigation, belong to experiences which are termed "inevitable accidents." There is testimony *pro* and *con* as to the wisdom of running the steamboat or beaching her upon the flat bar at the foot of Stork island. The master gave the proper order to the pilot to beach her upon a suitable bar. The pilot determined in good faith, and with all the consideration which the sinking condition of the vessel allowed, to beach her upon this Stork island bar. I think a decision thus reached, even if mistaken, would justify the insured. But it is not satisfactorily shown that it was a mistake.

4. The most vigorous defense is made upon the alleged negligence of the insured and their master after the beaching upon the Stork island bar, and until the complete destruction of the Natchez four or five days subsequently. There is testimony that boats furnished with pumping and working apparatus were at Vicksburg. The rule is correctly urged by the proctor for the defendants, that the master was bound to do all he could to relieve and save the insured property. But it is by no means certain that the help shown to exist was known to the master, or that, if summoned, it would have been effectual. In this connection should be considered the matter of claimed abandonment. As it is not made reasonably certain that any effective aid could have been obtained, I do not think it necessary to determine whether there was or not in law an abandonment. As to three of the defendants, the case shows that the manager of the insured told the agents of the insurers, one of whom had power to receive an abandonment, that the vessel was abandoned to

the underwriters, and believed they were going into possession of her through one of the agents; and was suffered by the insurers to continue in that belief till Friday evening, the evening before her complete physical destruction, when evidently nothing could be done to save her. I think the responsibility for no further or other efforts having been made to save vessel or machinery was upon the defendants, so far as they were represented by their agents, to such an extent as to leave them liable. It was possible for them to have taken possession. They left the manager of the plaintiffs, and through him the master, in the belief, the former that the insurers had taken, and the latter that they would take, possession, and guide the efforts to rescue. The master, under these circumstances, did what really seemed to him at the time to be wisest and most effective.

Upon these facts, I think the liability of the insurers continues. These facts, too, render it unnecessary to consider the question of total loss by the first grounding. As to the three defendants, if the insurers, by their own conduct, made the acts of the master their own, so far as relates to their obligation to indemnify, and if while a competent master was thus left in charge of the vessel, and was doing the best he could, the vessel became an actual total loss, there is no need of considering the questions of abandonment or of constructive loss. As to all the defendants, the final loss was physically absolute and total, and for this loss, upon the facts established, the insurers are liable. The evidence does not establish that any relief could have been obtained which could have prevented the total ultimate destruction. The master, Capt. Bowling T. Leathers, testifies that he had the opinion that nothing could have been done. With the vessel injured as she was by the first grounding, the river rapidly rising, and the boat ready to sink from her weakened and leaky condition, it is but an unsupported conjecture that a favorable result would have been attained if the attempt had been made to get the wrecking or pumping boats from Vicksburg. I think, therefore, that the libelant must have judgment in each of the four cases. The value of the Natchez is shown to have been about $150,000. She cost, in 1880 or 1881, $207,000. The amounts insured were as follows, viz.:

| | |
|---|---|
| By the Louisville Underwriters | $ 7,000 |
| By the Mannheim Insurance Co. | 5,000 |
| By St. Paul Fire and Marine Ins. Co. | 2,500 |
| By Dakota Fire and Marine Ins. Co. | 1,500 |
| Making a total insurance of | $16,000 |

—On a valuation of $30,000, the insurance not to exceed $20,000.

I think, therefore, the amount of recovery should be in each case the amount insured, i. e., as claimed in the several libels, with the following deductions as credits: I think the amount of the premium note in each case should be deducted upon condition that the note be surrendered; also that there should in each case be deducted the proportionate amount of the net sum realized from the sale of the cabin outfit, etc. The whole

sum was $623.69. The amount insured is, in each case, subject to a further deduction for the amounts paid for a previous partial loss on the same risk and policies as are here involved. There will be judgment for the libelant in each case for the amount insured, less these deductions, with interest from March 23, 1889, and the matter is referred to Commissioner Loew to make the proper deductions, upon the principles above stated.